IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 2, 2015


**STATE OF TENNESSEE v. WAYNE SANDERS**

**Appeal from the Criminal Court for Shelby County**
**No. 12-00669       W. Mark Ward, Judge**

_____

**No. W2014-01455-CCA-R3-CD  -  Filed July 1, 2015**

_____


The Defendant, Wayne Sanders, was charged with aggravated robbery.  After a jury trial, he was convicted of the lesser-included offense of aggravated assault.  On appeal, the Defendant argues that he was denied his right to a speedy trial and that the evidence was insufficient to support his conviction.  Upon review of the record and applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR. J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, and D. KELLY THOMAS, JR., JJ., joined.

Ruchee Patel, Memphis, Tennessee, for the Appellant, Wayne Sanders.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Meghan Fowler and Greg Gilbert, Assistant District Attorneys General, for the Appellee, State of Tennessee.


**OPINION**

**Factual and Procedural Background**

In October 2011, the Defendant was arrested for aggravated robbery.  He was indicted, along with six other co-defendants, in February of 2012.  The Defendant requested that the case be set for trial in October of 2012.  On August 5, 2013, the State informed the trial court that the victim, Lamain Boone, was deployed on active duty

military service and would not be available for the scheduled trial date.[1] Consequently, the trial date was rescheduled for January 21, 2014. On January 21, 2014, the State again asked the trial court to reset the trial date because Mr. Boone had not returned from military service. The Defendant opposed the continuance and moved that the case be dismissed for violation of the Defendant's right to a speedy trial. In response, the State noted that the case had been continued several times prior to August 5, 2013, at the Defendant's request.

The trial court noted that more than two years had passed since the Defendant's arrest. The Defendant argued that he suffered prejudice because two years had passed since the witnesses had given their statements to police and that it would be difficult to ensure that the witnesses testified truthfully on the stand. The State disagreed, noting that many of the witnesses had pled guilty to charges stemming from the same incident within the previous eighteen months and their statements made during their respective plea colloquies were consistent with the statements they gave to the Memphis Police Department in October 2011.

The trial court found that the length of the delay was sufficient to trigger a speedy trial analysis but also noted that only fifteen months had passed since the Defendant requested a trial. As to the reason for the delay, the trial court noted that Mr. Boone was in the military, but the trial court also considered the State's failure to take more proactive measures to compel the victim's attendance. The trial court found that the Defendant had not suffered prejudice. Consequently, the Defendant's motion to dismiss based upon a speedy trial violation was denied. The trial commenced on March 5, 2014.

At trial, Mr. Boone testified that he went to Eden Point Apartments to pick up Romisha Willis and take her to a store on the night of the offense. When Mr. Boone arrived, Ms. Willis got into the car, and Mr. Boone began to pull out of the parking lot. However, Ms. Willis asked to be let out of the car so that she could return to an apartment to retrieve something. Mr. Boone remained in the car. While Mr. Boone waited for Ms. Willis to return, "a tall dude with dreds" approached the driver's side window and asked for a cigarette. Mr. Boone told the individual that he did not have any cigarettes. At that time, a second man opened the passenger's side door, and the "tall dude with dreds" pulled out a gun, pointed it at Mr. Boone, and said, "[G]ive me your sh**." Mr. Boone told the man that he did not have anything. While Mr. Boone was focused on the man with the gun, another individual hit Mr. Boone in the face. After he was initially struck, "a whole bunch of people start hitting [Mr. Boone]." Mr. Boone reported that he was being hit from both sides. He was still restrained by his seatbelt, and he never tried to exit the car. During the altercation, Mr. Boone's car keys and cell phone were taken. Additionally, he lost one shoe when someone tried to pull him out of the car. Also,

---

[1] The record does not reflect when the trial was scheduled to start.

someone shattered the rear window of Mr. Boone's car. Eventually, Ms. Willis tried to stop the fight, retrieved Mr. Boone's keys, and gave them to him so he could leave. Mr. Boone returned to his home, and his mother took him to the hospital. Mr. Boone reported that he was afraid when he saw the gun pointed at him.

Later, Mr. Boone reviewed a photo lineup and identified one individual as a person who "look[ed] like the guy that pulled a gun on [Mr. Boone]." When asked if the individual who he identified in the lineup was in the courtroom, Mr. Boone identified the Defendant. Mr. Boone qualified that he "thought" the Defendant was the person who pointed the gun at him because he had never seen the Defendant before the night of the incident and he was covering his head to protect himself from being hit.

On cross-examination, Mr. Boone confirmed that he used to date Ms. Willis. He also admitted that he was unable to identify any of the defendants at the preliminary hearing. Mr. Boone explained that he only knew one other person, aside from Ms. Willis, at the apartment complex. He saw that person standing in front of his car during the attack, but that person never hit him. On redirect-examination, Mr. Boone stated that he had never seen the man who pointed the gun at him before the night of the offense.

Ms. Willis testified that she was dating Mr. Boone at the time of the offense. On the day of the offense, Darryl Smith asked her to call Mr. Boone and tell him to come to Eden Point Apartments so Mr. Smith could talk to Mr. Boone. According to Mr. Smith, Mr. Boone had gotten into a fight with Mr. Smith's brother earlier that day. Deangelo Smith, Demarcus Smith, and Christopher Curry were with Mr. Smith at the time.[2] Ms. Willis called Mr. Boone and requested that he come to the apartments to take her to the store. The plan was that Mr. Smith would confront Mr. Boone after he and Ms. Willis returned from the store.

Ms. Willis admitted that Mr. Smith appeared to want to fight Mr. Boone. However, she thought that the fight would be one-on-one between Mr. Boone and Mr. Smith—not a group of people against Mr. Boone. Mr. Boone came to pick up Ms. Willis, but Ms. Willis had to return to a friend's apartment to retrieve her money. While she was inside the apartment, she heard "a lot of commotion outside." When she went outside, she saw what appeared to be "the whole neighborhood" surrounding Mr. Boone's car and fighting him. Mr. Smith jumped on top of Mr. Boone's car and shattered the rear window. Ms. Willis, along with some female friends, approached the car and stopped the fight. After the fight subsided, Ms. Willis saw that Mr. Boone had sustained injuries to his eye and nose. Ms. Willis asked the Defendant for Mr. Boone's

---

[2] Ms. Willis does not include the individuals' last names. However, we glean their last names from the indictment as well as the fact that Deangelo and Demarcus were Mr. Smith's brothers.

keys, and the Defendant gave them to her. Ms. Willis gave the keys to Mr. Boone, and Mr. Boone left. Later, Ms. Willis learned that Deangelo Smith had Mr. Boone's phone.

On cross-examination, Ms. Willis admitted that she had reviewed her statement to police before testifying, but she maintained that she testified from her own memory of the events. She also clarified that she did not see the fight start.

Alondria Rice testified that she lived in Eden Point Apartments at the time of the offense. The night of the incident, Ms. Willis and a girl named Tajerika Johnson were at Ms. Rice's home. After the incident, Ms. Rice viewed a photo lineup and identified "Bang Wane"[3] as the person who held a gun to Mr. Boone's head. Ms. Rice explained that she did not see the gun pointed at Mr. Boone. However, after the fight she heard Bang Wane say he had held the gun to Mr. Boone's head. Ms. Rice identified the Defendant as Bang Wane. On cross-examination, Ms. Rice said she did not see the beginning of the fight.

Christopher Curry testified that he was a co-defendant in this case and that he had pleaded guilty to facilitation of aggravated robbery. Mr. Curry stated that the Defendant had dreds as long as he had known him. On the day of the offense, Mr. Smith had asked Ms. Willis to call Mr. Boone to Eden Point Apartments so that Mr. Smith could fight Mr. Boone in retaliation for Mr. Boone's "jumping" Mr. Smith's brother, Deangelo. Mr. Curry saw Mr. Boone arrive at the apartment complex. When Ms. Willis went inside the apartment, about forty people approached Mr. Boone's car. Mr. Curry admitted that he participated in the incident and that he hit Mr. Boone a couple of times. The Defendant was also present at the time of the offense, and he had a handgun. The Defendant "upped the gun" at Mr. Boone and told Mr. Boone to "give him everything [Mr. Boone] got." Mr. Boone's keys and phone and one of his shoes were taken during the course of the incident. On cross-examination, Mr. Curry said he could not remember whether the Defendant was the only person in the group with dreds. Additionally, Mr. Curry admitted that dreds were a common hairstyle.

Dontario King testified that he was also a co-defendant is this case and that he had pleaded guilty to facilitation of aggravated robbery. On the night of the incident, Mr. King was at Eden Point Apartments when Ms. Willis said she had a friend, Mr. Boone, whom she said had some money. Ms. Willis called Mr. Boone and asked him to come to the apartment complex. When Mr. Boone arrived, he was "jumped." Also, the Defendant held Mr. Boone at gunpoint. Mr. King reported that, when the Defendant pointed the gun at Mr. Boone, Mr. Boone "froze up." During the incident, Mr. Boone's

---

[3] The transcript of the proceedings uses the spelling "Bang Wang." However, Ms. Rice's handwritten note on the photo lineup spells the individual's nickname as "Bang Wane." We will use Ms. Rice's spelling in this opinion.

keys, phone, and shoe were taken. Mr. King saw Ms. Willis retrieve the keys from the Defendant.

Mr. Smith testified that he was also a co-defendant in this case and that he had entered a guilty plea. Mr. Smith admitted that he fought Mr. Boone and shattered the rear window of Mr. Boone's car on the night of the offense because Mr. Boone had engaged in an altercation with Mr. Smith's younger brother. Mr. Smith asked Ms. Willis to lure the Defendant to the apartment complex. Once Mr. Boone arrived, Mr. Smith planned to fight him. When Mr. Boone arrived at the apartment complex, the Defendant approached the car and told Mr. Boone to give him everything Mr. Boone had. At that point, several other individuals "jumped in" and the fight commenced. Once the fight started, the Defendant left. Mr. Smith reported that the Defendant had a gun. Mr. Smith stated that, after the fight was over, Ms. Willis found Mr. Boone's key on the ground. On the night of the incident, the Defendant had dreds, and Mr. Smith recalled that the Defendant was the only person involved in the incident who had dreds.

On cross-examination, Mr. Smith clarified that there were several people around at the time of the offense and some of them could have had dreds. However, the Defendant was the only person involved in the incident who wore that hairstyle.

Following deliberation, the jury convicted the Defendant of the lesser-included offense of aggravated assault. After a sentencing hearing, the Defendant was sentenced to six years' incarceration as a Range I offender.

## Analysis

On appeal, the Defendant argues that he was denied his right to a speedy trial and that the evidence was insufficient to support his conviction. The State first responds that the Defendant's appeal should be dismissed due to his failure to file a timely motion for new trial and notice of appeal. Thus, before we address the merits of the Defendant's claims, we must determine whether this appeal should be dismissed or whether any issues are waived due to the Defendant's untimely motion for new trial.

Tennessee Rule of Criminal Procedure 33(b) requires that a motion for new trial be made in writing and filed within thirty days of the date the sentencing order is entered. The trial court may not extend this time limit. Tenn. R. Crim. P. 45(b)(3). An untimely filed motion for new trial is a nullity and will not toll the thirty-day time period for filing a notice of appeal. State v. Davis, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987); see Tenn. R. App. P. 4(c).

However, a timely filed notice of appeal is not jurisdictional in this court, and we may elect to waive the requirement in the interest of justice. Tenn. R. App. P. 4(a). In

such cases, we may review issues that could result in an outright dismissal of the Defendant's conviction. Davis, 748 S.W.2d at 207; State v. Williams, 675 S.W.2d 499, 501 (Tenn. Crim. App. 1984).

In this case, the judgment was entered on April 15, 2014, and the Defendant's Motion for New Trial was untimely filed on May 20, 2014. Although the trial court entered an order denying the Motion for New Trial on May 27, 2014, the Motion for New Trial was a nullity and did not toll the thirty-day time period for the notice of appeal. Consequently, the Notice of Appeal was also untimely when it was filed on June 26, 2014.

However, we elect to waive the timely filing of a notice of appeal requirement in the interest of justice. Moreover, as acknowledged by the State, because both of the issues raised on appeal could bring about an outright dismissal of the Defendant's conviction, we will address the merits of the Defendant's claims.

*Right to a Speedy Trial*

The Defendant argues that he was denied his right to a speedy trial due to "bureaucratic indifference, intentional delay of trial, negligence, and lack of diligence" on the part of the State. The State argues that the trial court properly found that delay of trial was necessary because the victim he had been deployed with the Navy and was therefore unavailable to testify and that the Defendant was not prejudiced by the delay.

Both the United States and Tennessee Constitutions guarantee criminal defendants the right to a speedy trial. U.S. Const. amend. VI; Tenn. Const. Art. I § 9. Tennessee also has a statutory right to a speedy trial. See Tenn. Code Ann. § 40-14-101. However, the right to a speedy trial does not arise until the defendant has been arrested or an indictment has been issued. State v. Baker, 614 S.W.2d 352, 353 (Tenn. 1981). If the defendant's right to a speedy trial was violated, the only remedy is to dismiss the charges against him. Barker v. Wingo, 407 U.S. 514, 522 (1972); State v. Bishop, 493 S.W.2d 81, 83 (Tenn. 1973).

In Barker v. Wingo, the United States Supreme Court established four factors to be considered when determining whether a defendant's right to a speedy trial has been violated: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defendant. Barker, 407 U.S. at 530. Additionally, the Tennessee Supreme Court has stated that the strength of the State's case as to guilt can be used to help judge the four Barker factors. Bishop, 439 S.W.2d at 85.

A delay approaching one year will trigger a speedy trial analysis, and the presumption that delay has prejudiced the defendant intensifies over time. Doggett v. United States, 505 U.S. 647, 652 (1992); State v. Utley, 956 S.W.2d 489, 494 (Tenn. 1997). However, courts take into account the complexity of the case in evaluating the reasonableness of the length of delay. State v. Wood, 924 S.W.2d 342, 346 (Tenn. 1996). Further, the reason for the delay may justify it, and different reasons are assigned different weight in the balancing analysis. Barker, 407 U.S. at 531. For example, the State's deliberate attempt to delay trial to hamper the defense must be weighed heavily against the State. Id. However, "a valid reason, such as a missing witness, should serve to justify appropriate delay." Id. Finally, Barker listed three areas in which a defendant could suffer prejudice due to a delay: (1) oppressive pretrial incarceration; (2) anxiety and concern of the accused; and (3) impairment of the defense. Id. at 532. Of the three, impairment of the defense is the most serious way in which a defendant can be prejudiced. Id.

In this case, there was an almost two and one half year delay between the Defendant's arrest and trial. Such delay is sufficient to trigger a speedy trial analysis. See Utley, 956 S.W.2d at 494. Additionally, the Defendant asserted his right to a speedy trial. Therefore, we turn our attention to the reason for the delay and prejudice to the Defendant.

This case was complex, involving seven co-defendants and multiple witnesses. Further, the record reflects that the Defendant asked for continuances during the first year this case was pending. The State asked for a continuance because a key witness, the victim, was deployed with the Navy and unavailable to testify at the scheduled trial. As Barker noted, a missing witness is a valid reason for pretrial delay and should serve to justify appropriate delay. Barker, 407 U.S. at 531. As such, we cannot fault the State for asking for a continuance.

However, a justified delay does not end our inquiry. We must determine whether the Defendant suffered prejudice. The Defendant was incarcerated during the pendency of these proceedings. However, nothing in the record indicates that the defense was impaired. All of the anticipated witnesses were available for trial, and they all testified consistently with statements they had previously given to police. While we do not want to diminish the anxiety and concern the Defendant surely experienced while he was incarcerated prior to trial, we do not believe such experiences outweigh the State's justification for the delay.

This conclusion is fortified when viewed in light of the strength of the evidence of the Defendant's guilt. See Bishop, 439 S.W.2d at 85. Multiple witnesses saw the Defendant point a gun at Mr. Boone while Mr. Boone was in his vehicle. Additionally, Mr. Boone's description of the person with the gun is consistent with the Defendant.

Therefore, we conclude that the Defendant was not denied his right to a speedy trial.

*Sufficiency of the Evidence*

The Defendant also contends that the evidence presented at trial was insufficient to support his conviction of aggravated assault. The State argues that the evidence was sufficient to support the conviction. We agree with the State.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and the weight and value to be given the evidence are resolved by the fact finder. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978), superseded on other grounds by Tenn. R. Crim. P. 33 as stated in State v. Moats, 906 S.W.2d 431, 434 n.1 (Tenn. 1995). This Court will not reweigh the evidence. Id. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. Bland, 958 S.W.2d at 659; Tuggle, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

When identification is a material issue in the case, the following instruction must be given upon the Defendant's request:

> One of the issues in this case is the identification of the defendant as the person who committed the crime. The state had the burden of proving identity beyond a reasonable doubt. Identification testimony is an expression of belief or impression by the witness, and its value may depend upon your consideration of several factors. Some of the factors which you may consider are:
>
> > (1) The witness' capacity and opportunity to observe the offender. This includes, among other things, the length of

- 8 -

time available for observation, the distance from which the witness observed, the lighting, and whether the person who committed the crime was a prior acquaintance of the witness;

(2) The degree of certainty expressed by the witness regarding the identification and the circumstances under which it was made, including whether it is the product of the witness' own recollection;

(3) The occasions, if any, on which the witness failed to make an identification of the defendant, or made an identification that was inconsistent with the identification at trial; and

(4) The occasions, if any, on which the witness made an identification that was consistent with the identification at trial, and the circumstances surrounding such identifications.

Again, the state had the burden of proving every element of the crime charged, and this burden specifically includes the identity of the defendant as the person who committed the crime for which he or she is on trial. If after considering the identification testimony in light of all the proof you have a reasonable doubt that the defendant is the person who committed the crime, you must find the defendant not guilty.

State v. Dyle, 899 S.W.2d 607, 612 (1995); 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 42.05. In this case, the trial court properly instructed the jury as to identification.

The Defendant was convicted of aggravated assault. As relevant to this case, "a person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101, and . . . [u]ses or displays a deadly weapon[.]" Tenn. Code Ann. § 39-13-102(a)(1)(A)(ii) (Supp. 2011). "A person commits assault who . . . [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury[.]" Tenn. Code Ann. § 39-13-101(a)(2) (2010).

Admittedly, in this case Mr. Boone could only say that he thought the Defendant was the person who pointed the gun at him. However, Mr. Boone's description of the "tall dude with dreds" was consistent with the Defendant. Additionally, several other witnesses testified that they saw the Defendant approach Mr. Boone's car and point a gun at Mr. Boone through the car window. Further, other witnesses heard the Defendant say

he had pointed a gun at Mr. Boone.  Mr. Boone testified that he was afraid.  Based on the evidence presented, we conclude there was sufficient evidence to support the Defendant's conviction for aggravated assault.

## Conclusion

For the aforementioned reasons, the judgment of the trial court is affirmed.


_____

ROBERT L. HOLLOWAY, JR., JUDGE